NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JOE SAMUEL BAILEY,                        )
LASERSCOPIC SPINAL CENTERS OF             )
AMERICA, INC.; LASERSCOPIC                )
MEDICAL CLINIC LLC;                       )
LASERSCOPIC DIAGNOSTIC                    )
IMAGING AND PHYSICAL THERAPY              )
LLC; LASERSCOPIC SPINAL                   )
CENTER OF FLORIDA, LLC; and               )
LASERSCOPIC SURGERY CENTER                )
OF FLORIDA,                               )
                                          )
        Appellants/Cross-Appellees,       )
                                          )
v.                                        )        Case No. 2D17-895
                                          )
JAMES S. ST. LOUIS, D.O.;                 )
MICHAEL W. PERRY, M.D.; EFO               )
HOLDINGS L.P.; EFO GENPAR, INC.;          )
EFO LASER SPINE INSTITUTE, LTD.;          )
LASER SPINE INSTITUTE, LLC;               )
LASER SPINE MEDICAL CLINIC, LLC;          )
LASER SPINE PHYSICAL THERAPY,             )
LLC; and LASER SPINE SURGICAL             )
CENTER, LLC,                              )
                                          )
        Appellees/Cross-Appellants.       )
_____ )

Opinion filed December 28, 2018.

Appeal from the Circuit Court for
Hillsborough County; Richard A. Nielsen,
Judge.

William J. Schifino of Burr & Forman LLP
Tampa; Stuart C. Markman, Kristin A.

Norse, and Robert W. Ritsch of Kynes,
Markman & Felman, P.A., Tampa;
Jennifer G. Altman and Shani Rivaux of
Pillsbury Winthrop Shaw, Pittman LLP,
Miami, for Appellants/Cross-Appellees.

Stacey D. Blank and Joseph H.
Varner, III of Holland & Knight LLP, Tampa,
for Appellees/Cross-Appellants.

KELLY, Judge.

This is the second appeal from a final judgment entered in favor of the appellants/cross-appellees in an action against the appellees/cross-appellants for breach of fiduciary duty, conspiracy, defamation, slander per se, tortious interference, and violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). The factual background underlying this litigation is fully set forth in Bailey v. St. Louis, 196 So. 3d 375 (Fla. 2d DCA 2016) (Bailey I), and repeating it here is unnecessary. In Bailey I, we affirmed the final judgment but reversed the damages awarded by the trial court. On remand, with the exception of adding an award for punitive damages, the trial court awarded the same damages this court had previously reversed. Again, we reverse those awards. As to the remaining issues raised in the appeal and in the cross-appeal, we affirm without further comment.

In Bailey I, the appellants had prevailed on claims for breach of fiduciary duty, conspiracy, slander per se, tortious interference, and violation of FDUTPA. We reversed the damages awarded for everything but slander per se because, as explained in our opinion, we could not square the awards with the evidence or the trial court's findings, which were quite limited with respect to damages. See 196 So. 3d at 377. We

also reversed the trial court's decision not to award monetary damages for the appellees' FDUTPA violations and not to award punitive damages. See id. We determined that the trial court incorrectly ruled that it could not award monetary damages under FDUTPA and that it also erroneously found that the facts did not support an award of punitive damages. See id.

There were two components to the total damage award of $1,600,000 at issue in Bailey I. The first was an award of $300,000 to Laserscopic Spine Centers of America, Inc. (Spine), for out-of-pocket damages for tortious inference. With respect to this award we stated, "In its order, the trial court accepted the calculations of only one of the experts 'as to out of pocket losses,' and it found that the expert testified that the Appellants suffered out-of-pocket damages of $6,831,172." 196 So. 3d at 377 (footnote omitted). Yet, the *total* award of damages was only $1,600,000. The trial court offered no explanation as to how it ended up entering a total award that was less than one-fourth of the amount it cited for out-of-pocket damages alone, and the record provided no insight into the basis for the award.[1]

On remand, the trial court again awarded $300,000. By way of explanation, the court stated that it had rejected the appellants' expert's testimony as to out-of-pocket losses. However, as explained in Bailey I, the trial court had expressly accepted the expert's calculation regarding out-of-pocket losses. The court purports to

---

[1]The appellees' argument to the trial court was not helpful in terms of understanding the award. Their approach to damages had been to simply argue that the appellants had not proved they suffered *any* damages as a result of the appellees' conduct. They did not challenge the appellants' out-of-pocket figure, nor did they offer any alternative theory upon which the trial court might have based its award of $300,000.

explain how it determined that $300,000 was the proper award. Its reasoning, however, is nearly a verbatim repeat of the arguments the appellees unsuccessfully urged us to accept in Bailey I. Moreover, the court's explanation rests on the flawed premise that it had rejected the expert's calculations. Accordingly, we again reverse the trial court's award to Spine and remand for entry of an award in the amount of $6,831,172, which is the amount the trial court found was established by the appellants' expert's testimony.

The remaining $1,050,000 of the damage award was the second component at issue in Bailey I. Appellant Laserscopic Spinal Centers of America, Inc. (Spinal), was awarded damages for breach of fiduciary duty, conspiracy, and tortious interference, while appellant Laserscopic Medical Clinic, LLC (LMC), received an award on a claim for breach of fiduciary duty. The appellants had sought damages under various theories, including disgorgement. On appeal, the appellants argued that the trial court had awarded no disgorgement damages, while the appellees argued that the entire $1,050,000 was an award of "lost profits measured by the yardstick of [Laser Spine Institute's] allegedly ill-gotten profits, which [it] was similarly required to disgorge." Because of the way the trial court had prepared its order, it was not possible to determine with certainty whether all or a portion of the award was for disgorgement. What we could determine, however, was that if it was for disgorgement, it was "grossly insufficient." Id. at 378.

The appellants had sought disgorgement of approximately $264,000,000. This figure represented the value of Laser Spine Institute (LSI) in 2009 plus $77.5

million in distributions paid to the owners between 2005 and 2009.[2] In their argument to the trial court, the appellees had taken the position that even if the court found some wrongdoing, any profits LSI earned were attributable solely to the efforts of management and not to any wrongdoing; therefore, the court should not award anything to the appellants.[3] Because it was their position that the appellants were not entitled to any damages, the appellees did not put on any evidence as to what amount of LSI's profits short of $264,000,000 could be attributed to their wrongful conduct.

On appeal, and without explaining how the court might have arrived at $1,050,000 rather than $264,000,000, the appellees argued the award reflected the trial court's conclusion that only this portion of LSI's profits was attributable to the appellees' wrongdoing. In support of this, the appellees pointed to the "Damages" section of the trial court's order and specifically to the trial court's citation to Pidcock v. Sunnyland America, Inc., 854 F. 2d 443, 447-48 (11th Cir.1988). The trial court cited Pidcock for the proposition that a plaintiff may only recover profits attributable to the underlying

---

[2]While the parties have referred to the recovery the appellants sought as disgorgement of profits, it would be more accurate to describe it as disgorgement of the appellees' wrongful gain. See Restatement (Third) of Restitution and Unjust Enrichment § 3 (Am. Law. Inst. 2011). A conscious wrongdoer is liable for the "net profit attributable to the underlying wrong." Restatement (Third) of Restitution and Unjust Enrichment § 51(4). As used in section 51(4), "[p]rofit includes any form of use value, proceeds, or consequential gains." Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(a). The appellees have not challenged, nor have we considered, the use of these particular elements to calculate "profit" for the purposes of disgorgement. Nor have they challenged the accuracy of the amounts testified to by the appellants' expert. At trial they offered no alternative method by which to calculate the amount of profits subject to disgorgement because it was their position that *none* of the profits LSI earned were subject to disgorgement.

[3]In Bailey I we discussed at length the trial court's findings regarding the appellees' wrongful conduct. 196 So. 3d at 377-78. When we reference "wrongdoing" in this opinion we are referring to the conduct we detailed in Bailey I.

wrong and not profits attributable to a defendant's "special or unique efforts" and that "aggressive or enterprising" management activities "may break the causal chain" between the wrongdoing and the defendant's profits. This, according to the appellees, was the reason the trial court limited the award. We will not repeat our discussion of Pidcock here. Suffice it to say that we thoroughly analyzed its applicability to the facts as found by the trial court, and we concluded that the limiting principles Pidcock discusses were inapplicable. See Bailey I, 196 So. 3d at 378. Thus, we held that if the award was for disgorgement, it was "grossly insufficient." See id.

Although we did not address it in our opinion, the appellees also argued that "in cases involving the misappropriation of proprietary information, a court will limit the disgorgement of a defendant's profits 'to the amount of time it would have taken the defendant to independently develop its product without the benefit of the plaintiff's trade secrets—in other words, the "head start" period.'" Thus, they argued that the trial court awarded "lost profits/disgorgement damages in an amount equal to the profits LSI derived from this head start." However, the trial court had found the appellants' misappropriation claims were barred by the statute of limitations. Further, at trial the appellants' did not seek to recover lost profits, instead focusing on disgorgement, business destruction damages, and out-of-pocket damages. Accordingly, we rejected this argument as well.

On remand, the trial court confirmed it was awarding disgorgement damages but then entered the same award we had reversed as "grossly inadequate." This appears to have happened because the appellees convinced the trial court that we had not actually found the award to be inadequate, we had simply found it to be

inadequately explained. And as was the case with the out-of-pocket award, the appellees apparently convinced the trial court it could explain its award by adopting the arguments the appellees had made and we had rejected in Bailey I.

In explaining the award on remand, the trial court's overarching focus is on why it believed Spinal was not successful, which as we explain below, is not part of the equation for determining the degree to which a wrongdoer's profits are attributable to its wrongful conduct. First, the trial court points to the appellants' "lack of business skills" and states that because of their lack of skill and poor business decisions they "should not be awarded disgorgement damages beyond the amounts in the final judgment." It also states it is rejecting the appellants' demand for disgorgement damages equal to all the profits earned by LSI because there is no causal relationship between the appellees' tortious conduct and all the profits. The court elaborates, stating that the appellees succeeded because of a "unique combination of individual, skilled medical doctors; highly effective and inventive executives, managers and administrators; creative marketing and advertising programs; and the availability and use of proper capital" and that even though Spinal "followed the same business model, it was not able to succeed."

The trial court's focus on the appellants' supposed lack of business skills as a basis to limit disgorgement shows a complete misapprehension of the principles applicable to disgorgement. Disgorgement is a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior. See Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So. 3d 689, 698 (Fla. 3d DCA 2018) ("'Disgorgement is an equitable remedy intended to prevent unjust enrichment.'"

(quoting S.E.C. v. Monterosso, 757 F. 3d 1326, 1337 (11th Cir. 2014))); Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. Law Inst. 2011) ("A person who is unjustly enriched at the expense of another is subject to liability in restitution."); Restatement (Third) of Restitution and Unjust Enrichment § 3 ("A person is not permitted to profit by his own wrong.").  The point of disgorgement is to deter wrongdoers by stripping them of the gains from their conduct:

> Restitution requires full disgorgement of profit by a conscious wrongdoer, not just because of the moral judgment implicit in the rule of this section, but because any lesser liability would provide an inadequate incentive to lawful behavior.  If A anticipates (accurately) that unauthorized interference with B's entitlement may yield profits exceeding any damages B could prove, A has a dangerous incentive to take without asking—since the nonconsensual transaction promises to be more profitable than the forgone negotiation with B.  The objective of that part of the law of restitution summarized by the rule of § 3 is to frustrate any such calculation.

Id. § 3 cmt. c; see also § 51 cmt. e ("The object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment.").

This case is a classic example of what this comment from the Restatement describes.  As we detailed in Bailey I, when the appellants did not accept the appellees' offer to invest in Spinal, the appellees told them "you're going to accept this offer or we're going to take your doctors and we're going to take your company. And we're going to go up the street and we're going to do it ourselves."  196 So. 3d at 380.  When threatened with litigation, the appellees said they were not concerned because the business would make ten times whatever damages they might have to pay in a lawsuit.  See id. at 380-81.

Had the appellants been limited to recovering under a lost profits theory, that prediction would unquestionably be accurate. However, the measure of damages for disgorgement is not the profits the appellants might have made absent the wrongdoing—the measure of damages for conscious wrongdoing is the appellees' "net profit attributable to the underlying wrong." Restatement (Third) of Restitution and Unjust Enrichment § 51(4); see also Duty Free, 253 So. 3d at 698 ("The equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains rather than the plaintiff's losses."). "When the defendant has acted in conscious disregard of the claimant's rights, the whole of the resulting gain is treated as unjust enrichment, even though the defendant's gain may exceed" the claimant's loss. Restatement (Third) of Restitution and Unjust Enrichment § 3 cmt. c. In fact, disgorgement may be awarded even if the claimant has not sustained any loss. Restatement (Third) of Restitution and Unjust Enrichment § 3, reporter's note a. ("[I]t is clear not only that there can be restitution of wrongful gain exceeding the plaintiff's loss, but that there can be restitution of wrongful gain in cases where the plaintiff has suffered an interference with protected interests but no measurable loss whatsoever."). The trial court's comments regarding the appellants' business acumen are misplaced in determining a disgorgement award.

To the extent the trial court's order can be read to rely on the limiting principles articulated in Pidcock, we specifically considered and rejected the applicability of those principles in Bailey I. See 196 So. 3d at 378-79. Our rejection of this as a basis to limit the award of disgorgement was the law of the case, and the trial court was bound by our determination. See Specialty Rests. Corp. v. Elliott, 924 So. 2d 834, 837 (Fla. 2d DCA 2005) ("[Q]uestions of law that have actually been decided on appeal must

govern the case in the same court and in the trial court through all subsequent stages of the proceedings."). Moreover, the "business model" to which the court attributes the appellees' success is the one it stole from the appellants along with its doctors, key employees, and everything else. In other words, what the trial court said amounts to a finding that the appellees' success was in fact attributable to their wrongdoing.

Lastly, the trial court sets out the reasoning it used to arrive at the figure of $1,050,000. However, it relies on the "head start" formula the appellees unsuccessfully argued in support of the award in Bailey I. As explained above, we rejected that argument as inapposite. Further, the trial court took this "head start" concept and more or less turned it on its head. The trial court reasoned that Spinal's operations were interrupted for approximately six months; therefore, the appellants were only entitled to six months of LSI's profits. Again, the trial court misapprehends the nature of the disgorgement remedy by measuring the award based on what the *appellants lost*—six months of profits—not what the appellees gained. See Guyana Tel. & Tel. Co., Ltd. v. Melbourne Int'l Commc'ns, Ltd., 329 F. 3d 1241, 1249 (11th Cir. 2003) (reversing where a jury was instructed to measure the plaintiff's right to restitution in terms of its loss rather than the benefit conferred on the defendants because "[r]estitution is a remedy that is often available to victims of a wrong. Restitution measures a plaintiff's recovery according to the defendant's, rather than the plaintiff's, rightful position").

Accordingly, we again reverse the awards for breach of fiduciary duty, conspiracy, and tortious interference and remand for the court to enter an award of disgorgement. Because the only testimony regarding the manner in which the disgorgement award should be measured came from the appellants' expert, the award

should be calculated according to the formula he proposed.  Specifically, the court should enter an award based on the total value of LSI in 2009 combined with the total of the distributions to the owners of LSI between 2005 and 2009.[4]  We also reverse the award for out-of-pocket damages and remand for entry of an award of $6,831,172.

Reversed and remanded for entry of a judgment in accordance with this opinion.

CASANUEVA and CRENSHAW, JJ., Concur.

---

[4]It appears from the evidence in the record that the proper amount of the award at a minimum falls between $264,000,000 and $265,000,000.